**AMERICAN HOSPITAL ASSOCIATION,**
**Plaintiff-Appellant,**

**v.**

**Richard S. SCHWEIKER, et al.,**
**Defendants-Appellees,**

**and**

**Illinois Migrant Council, et al., Interven-**
**ing Defendants-Appellees.**

**No. 82–1295.**

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 27, 1982.

Decided November 1, 1983.

William G. Kopit, Epstein, Becker, Borsody & Green, P.C., Washington, D.C., for plaintiff-appellant.

Shalom Brilliant, U.S. Dept. of Justice, Washington, D.C., for defendants-appellees.

Nelson A. Soltman, Legal Assistance Foundation of Chicago, Chicago, Ill., for intervening defendants-appellees.

Before CUDAHY and COFFEY, Circuit Judges, and WISDOM, Senior Circuit Judge.*

CUDAHY, Circuit Judge.

This case involves a challenge to certain regulations issued on May 18, 1979, by the Secretary of Health, Education and Welfare (now Health and Human Services) (the "Secretary") pursuant to Title VI (the "Hill-Burton Act") and Title XVI of the Public Health Service Act, 42 U.S.C. §§ 291, 300o et seq. (1976). The regulations, published at 42 C.F.R. § 124, Subparts F and G, impose specified obligations for community service and uncompensated care upon hospitals which received funds under the Hill-Burton Act. The American Hospital Association ("AHA"), on behalf of those hospitals, sued to have the 1979 regulations declared invalid, arguing that they violated statutory, contractual and constitutional rights. The district court granted summary judgment in favor of the Secretary. We affirm.

I

In 1946, in response to President Truman's call to enact legislation which would ensure adequate health care for all Americans, see President Truman's Message to Congress on Health Legislation, 1945 U.S. CODE CONG.SERV. 1143, Congress passed the Hospital Survey and Construction Act, Pub.L. No. 79–725, 60 Stat. 1040 (1946), presently codified as Title VI of the Public Health Service Act, 42 U.S.C. § 291. Title VI, commonly known as the Hill-Burton Act, was intended to address post-Depression and post-war problems with respect to the adequacy and distribution of health service facilities by means of a program of grants-in-aid to the states. See Statement of Senator Hill, in Hearings on S. 191 Before the Senate Comm. on Education and Labor, 79th Cong., 1st Sess. 6–9 (1945). The stated purpose of the Hill-Burton Act, in addition to the development and improvement of physical facilities and the promotion of research, was:

> to assist the several States in the carrying out of their programs for the construction and modernization of such public or other non-profit community hospitals and other medical facilities as may be necessary, in conjunction with existing facilities, to furnish adequate hospital, clinic, or similar services to all their people....

42 U.S.C. § 291. States wishing to obtain the federal financial assistance—outright grants, loans and loan guaranties—were required to submit to the Surgeon General for his approval a state plan for carrying out the congressional purpose. 42 U.S.C. § 291d.

Most importantly to the issues involved in this litigation, the Hill-Burton Act provided that:

> The Surgeon General ... shall by general regulations prescribe—
>
> \* \* \* \* \* \*
>
> (e) that the State plan shall provide for adequate hospitals, and other facilities for which aid under this part is available,

---

* The Honorable John Minor Wisdom, Senior Circuit Judge of the United States Court of Appeals for the Fifth Circuit, is sitting by designation.

for all persons residing in the State, and adequate hospitals (and such other facilities) to furnish needed services for persons unable to pay therefor. Such regulations may also require that before approval of an application for a project is recommended by a State agency to the Surgeon General for approval under this part, assurance shall be received by the State from the applicant that (1) the facility or portion thereof to be constructed or modernized will be made available to all persons residing in the territorial area of the applicant; and (2) there will be made available in the facility or portion thereof to be constructed or modernized a reasonable volume of services to persons unable to pay therefor, but an exception shall be made if such a requirement is not feasible from a financial viewpoint.

42 U.S.C. § 291c(e).[1] Thus the statute required the state plan (1) to make provision for adequate health facilities for all persons residing in the state and (2) to furnish necessary services to persons unable to pay. The regulation or regulations which the Surgeon General (later the Secretary[2]) was directed to issue could require as a condition of approval of a project that the state give certain "assurances": (1) that the facility would be made available to all persons residing in the territorial area of the applicant and (2) that there would be made available in the facility a reasonable volume of services to persons unable to pay. These two assurances have become known, respectively, as the "community service assurance" and the "reasonable volume" or "uncompensated care assurance."

The regulations issued from 1947 to 1972 in implementation of this statutory provision essentially tracked the language of the statute, see 42 C.F.R. §§ 53.61–53.63 (Supp. 1947); and, although over $4.4 billion in grants and $2 billion in loans and loan guaranties were authorized between 1947 and 1974, see S.Rep. No. 1285, 93d Cong., 2d Sess., reprinted in 1974 U.S.CODE CONG. & AD.NEWS 7842, 7860, the hospitals receiving aid displayed a marked reluctance to give even the most token charitable care. See Comment, Provision of Free Medical Services by Hill-Burton Hospitals, 8 Harv.C.R.–C.L. L.REV. 351, 352 (1973). After—and apparently in response to—a series of lawsuits brought by several private citizens and public interest groups against federally assisted hospitals to enforce compliance with the Hill-Burton obligations, see, e.g., Euresti v. Stenner, 458 F.2d 1115 (10th Cir.1972); Cook v. Ochsner Foundation Hospital, 61 F.R.D. 354 (E.D.La.1972), the Secretary began in 1972 to issue regulations which defined standards for compliance with the assurances. These regulations specified what was to be deemed a "reasonable volume of services" in terms of a quantitative presumptive compliance level, defined "persons unable to pay," established standards for compliance with the community service assurance and initiated various reporting requirements to ensure compliance. See 42 C.F.R. §§ 53.111, 53.113 (1974).

In 1975 a new federal assistance program for hospital construction and modernization was established to replace Title VI. This later program, Title XVI of the Public Health Service Act, now codified at 42 U.S.C. § 300q et seq., provides for assurances similar to those in Title VI but adds teeth to the Title VI requirements as well. Thus, Title XVI requires applicants for federal aid to give:

1. This is the current version of the provision. The Hill-Burton Act was amended in 1964, but this assurances language remained substantially the same except for the elimination of language allowing provision of "separate but equal" facilities. The section deleted in 1964 read as follows:

> ... [available to all persons] without discrimination on account of race, creed, or color, but an exception shall be made in cases where separate hospital facilities are provided for separate population groups, if the plan makes equitable provision on the basis of need for facilities and services of like quality for each such group....

60 Stat. 1040, 1043.

2. The Office of Surgeon General was abolished and this function was transferred in 1966 to the Secretary of Health, Education and Welfare. Reorg. Plan No. 3 of 1966, 31 Fed.Reg. 8855 (1966).

reasonable assurance that at all times after such application is approved (i) the facility or portion thereof to be constructed, modernized, or converted will be made available to all persons residing or employed in the area served by the facility, and (ii) there will be made available in the facility or portion thereof to be constructed, modernized, or converted a reasonable volume of services to persons unable to pay therefor and the Secretary, in determining the reasonableness of the volume of services provided, shall take into consideration the extent to which compliance is feasible from a financial viewpoint.

42 U.S.C. § 300s–1(b)(1)(K). Apparently in recognition of the compliance problems which had arisen under the Hill-Burton program, Title XVI mandates, rather than permits, the Secretary to prescribe by regulation the manner in which all recipients of financial assistance under either Title VI or Title XVI "shall be required to comply with the assurances required to be made at the time such assistance was received and the means by which such entity shall be required to demonstrate compliance with such assurances." 42 U.S.C. § 300s(3). The Secretary is also given extensive investigative and enforcement power by Title XVI. 42 U.S.C. § 300s–6.

The regulations which have given rise to the instant litigation were issued by the Secretary in response to this mandate. See 44 Fed.Reg. 29,372–29,410 (1979). The sections of the regulations relevant here are set forth in the Appendix to this opinion. Briefly, the 1979 regulations apply to all health facilities which gave assurances under either Title VI or Title XVI. The obligations under Title VI are made to continue for twenty years after the completion of construction or until the amount of the grant or loan is repaid,[3] 42 C.F.R. § 124.-501(b)(1), although they have no retroactive application to the period prior to the effective date of the regulations. See 44 ·Fed. Reg. 29,372–29,374 (1979). In carrying out

the uncompensated care assurance, Subpart F of the regulations sets a quantitative annual standard of compliance by requiring uncompensated care equal to the lesser of either 3% of the facility's operating cost for the last fiscal year or 10% of all federal assistance received by the facility, adjusted to make allowance for inflation for each year after 1979 (in effect prescribing the meeting of the obligation in the equivalent of 1979 dollars). 42 C.F.R. § 124.503(a). If in any year a facility is financially unable to meet this standard, the deficit may be made up in the following year, or in years subsequent to that, and, if necessary, at the end of the twenty-year period of obligation. 42 C.F.R. § 124.503(b). Excesses will similarly be applied as credits against subsequent years' obligations. 42 C.F.R. § 124.503(c). The regulations also specify that amounts received as reimbursement from insurance programs or under Medicare or Medicaid may not be counted in computing the amount of uncompensated services rendered. 42 C.F.R. § 124.509.

With respect to the community service assurances, Subpart G of the regulations requires that the federally assisted health facilities be made available to all residents and prohibits the exclusion of anyone in the area served by the hospital on the basis of any factor unrelated to need. The facility may, however, deny services to individuals unable to pay for them if the facility is not required to accept these patients under the uncompensated care requirements of Subpart F. 42 C.F.R. § 124.603(a)(1). The regulations also specifically address certain denials of medical services which are impermissible. These denials include refusals to participate in the Medicare ·and Medicaid programs or discrimination against individuals who are recipients of aid under those programs. 42 C.F.R. § 124.603(c). The regulations also prohibit adherence to certain admissions policies which would have the effect of excluding individuals on impermissible. grounds. 42 C.F.R. § 124.-

---

**3.** Obligations under Title XVI are not limited to any period of time, 42 U.S.C. § 300s–

1(b)(1)(K), 42 C.F.R. § 124.501(b)(2).

603(d). As an example of such prohibited practices, the regulations cite a policy of accepting only patients with private physicians who have staff privileges at the hospital. The rules require that the facility make alternative arrangements to ensure that its services are available to patients of this kind, and the regulations contain illustrative examples of such arrangements— the extension of temporary privileges to the person's physician; the referral of patients to a doctor with staff privileges; the establishment of a clinic through which such patients may be treated and, if necessary, admitted; the entering into contracts with qualified physicians and other arrangements. 42 C.F.R. § 124.603(d)(1). Similarly, if most physicians on the staff of a Hill-Burton hospital refuse to accept Medicare and Medicaid patients, so that beneficiaries of such aid are effectively excluded from admission, the hospital must establish alternative arrangements to make facilities available to such persons. 42 C.F.R. § 124.-603(d)(2). The requirement of a pre-admission deposit which acts to exclude otherwise eligible individuals is also prohibited. 42 C.F.R. § 124.603(d)(3). The regulations also contain provisions regarding notice to patients of the facilities' obligations, reporting and record-keeping requirements and mechanisms for investigation and enforcement. 42 C.F.R. §§ 124.604–124.606.

On June 27, 1979, the AHA filed suit against the Secretary seeking to have the 1979 regulations enjoined, and moved on August 27, 1979, for a temporary restraining order. On August 31, 1979, the district court denied the motion for a temporary restraining order and granted leave to intervene as defendants to various individuals and public interest organizations concerned with health care, rights of welfare recipients and the status of migrant workers. On October 1, 1979, the AHA's motion for a preliminary injunction was also denied. On July 2, 1980, this court affirmed the denial of preliminary relief. *American Hospital Ass'n v. Harris,* 625 F.2d 1328 (7th Cir.1980).

Thereafter, on September 24, 1980, the AHA filed a motion for summary judgment, and defendants subsequently filed cross-motions to the same effect. On January 8, 1982, the district court denied the AHA's motion and granted summary judgment in favor of the defendants. *American Hospital Ass'n v. Schweiker,* 529 F.Supp. 1283 (N.D.Ill.1982). The AHA appeals from this denial, arguing, as it did below, that the 1979 regulations exceed the Secretary's statutory authority, that they violate contractual agreements between the federal government and the assisted hospitals by altering and expanding their obligations under those agreements and that they violate the due process clause by impairing the hospitals' contractual rights.

## II

This case involves review of these administrative regulations pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701–706. No challenge has been raised to the procedural adequacy of the administrative proceeding. Setting aside for a moment the contractual and constitutional claims, which we shall discuss in Part III, *infra,* our consideration is limited to certain specific questions. We must first inquire whether the Secretary, in promulgating the 1979 regulations, acted within the scope of his statutory authority. 5 U.S.C. § 706(2)(C); *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). If we conclude that he was so acting, the regulations cannot be set aside unless we find that they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Batterton v. Francis,* 432 U.S. 416, 426, 97 S.Ct. 2399, 2406, 53 L.Ed.2d 448 (1977). Put another way, a reviewing court will sustain any regulation promulgated under a statute if it is " 'reasonably related to the purposes of the enabling legislation.' " *Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 369, 93 S.Ct. 1652, 1660, 36 L.Ed.2d 318 (1973), *quoting Thorpe v. Housing Authority of the City of Durham,* 393 U.S. 268, 280–81, 89 S.Ct. 518, 525, 21 L.Ed.2d 474 (1969). This standard of review is highly deferential; it begins with a presumption

that the agency action is valid and affirms the agency decision if it has any rational basis, thereby refusing to substitute the court's own judgment for that of the agency, *Ethyl Corp. v. Environmental Protection Agency,* 541 F.2d 1, 34 (D.C.Cir.), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976).

We note, first of all, that the authority conferred upon the Secretary under the Hill-Burton Act is very broad. He was required to issue general regulations to ensure that the various state plans provide that the facilities established with the aid of federal funds be made available to all residents of the community and that they furnish services to persons unable to pay, 42 U.S.C. § 291c(e), and he was directed to approve only applications for aid which were in compliance with the regulations issued pursuant to his authority under section 291c, 42 U.S.C. § 291e(b)(2). Under the statutory scheme, therefore, Congress expressly delegated to the Secretary the authority to set standards of compliance with the Act's goals; in establishing these standards the Secretary engages in what is commonly called "legislative rulemaking." *See, e.g., Batterton v. Francis,* 432 U.S. at 425, 97 S.Ct. at 2405; 2 K. DAVIS, ADMINISTRATIVE LAW TREATISE § 7:8 (2d ed. 1979).

We think it is clear that the Secretary was acting within the scope of his statutory mandate[4] when he promulgated the regulations here. Although the AHA contends that the Hill-Burton Act was merely a construction statute with a non-discrimination clause attached, such a contention is difficult to reconcile with the specific statutory language requiring assurances that the facilities constructed be available to all residents and in particular to those unable to pay for medical services.

Moreover, the legislative history of the Hill-Burton Act, both in its origins and as it has evolved through amendment, indicates that it was intended to be more than a construction statute. Although the assurances were not in the original bill introduced by Senator Hill in 1945, Hearings on S. 191 Before the Senate Comm. on Education and Labor, 79th Cong., 1st Sess. 1–6 (1945) [hereinafter "1945 Hearings"], the records of the Senate hearings demonstrate that the provision of medical services to indigents was a recurrent theme. *See* 1945 Hearings at 177 (statement of Senator Murray); at 190, 212, 245 (remarks of Senator Ellender); at 30 (remarks of Senator Chavez). A particularly revealing colloquy took place among Senator Ellender, Senator Pepper, Senator Taft and Dr. Frederick D. Mott, an official of the Department of Agriculture, on March 12, 1945:

Senator Taft. Let me suggest something else. You would say a hospital accepting aid of this kind should have an obligation to take care of a certain number of indigent patients. Most of them do, but I mean if they are going to have Federal money, should there not be a definite obligation to handle a certain number of indigent patients?

Dr. Mott. Senator, I would think there would certainly be an obligation to meet the needs of all the people of that hospital service area for which the hospital was designed, which would, of course, include many indigent and medically indigent.

\* \* \* \* \* \*

Senator Pepper. This is what occurred to me, Senator . . . that in determining the burden which the hospital would be expected to carry, they might not be able to get Federal aid unless they agreed to take a fixed number of indigent patients.

---

4. Although, as the appellant points out, the preamble to the 1979 regulations recites that they are issued under the authority of Title XVI, we do not think that this point is critical to our review of the Secretary's authority. First of all, Title XVI is in effect the successor statute to Title VI and specifically confers authority upon the Secretary to issue regulations prescribing the standards for compliance with the assurances given under Title VI as well. 42 U.S.C. § 300s(3). Since we find that the Secretary could have drawn his authority to issue the regulations here in question from either provision, the fact that Title XVI is named in the preamble to the regulations is not controlling.

Senator Taft. That is what I mean. I imagine every hospital of a general nature would be lucky if they did not have 20 percent of indigent patients.

\* \* \* \* \* \*

Senator Ellender. If people in all localities were able to pay for hospitalization there would be no need for this bill. It seems to me that our primary purpose should be to devise means to take care of those who cannot take care of themselves. My reason for supporting a bill providing for Federal aid to build hospitals is to make it easy for the community in which a hospital may be built to give aid to the indigent. . . .

Senator Taft. My interest in it is like in a public works bill, just to provide construction. But beyond that, these facilities must be made available to the people. 1945 Hearings at 190–91. This discussion indicates that provision of medical services for the indigent was a major concern among supporters of the bill; it also points out the contemporary assumption that hospitals would voluntarily provide charitable services at low or no cost to the poor. The hospitals' compliance with the assurances which were later inserted into the bill may well have been taken for granted, once the federal government enabled them to construct facilities.

The provision adding the community service and uncompensated care obligations to the Hill-Burton Act first appeared in late 1945 in the report of a subcommittee of the Senate Committee on Education and Labor; the subcommittee was made up of Senators Hill, Ellender, Taft, Tunnell and LaFollette. Senate Comm. on Education and Labor, S.Rep. No. 674, 79th Cong., 1st Sess. 9, 17 (1945). The subcommittee described the changes from the original bill, changes which included the assurances, as authorizing "Federal regulatory powers . . . consistent with effective Federal control of appro-

priated moneys." *Id.* at 8. Neither the committee nor the Congress discussed these provisions in further detail at that time.[5]

In any event, one may infer from the provisions' mere presence in the statute that the free care obligation was intended to have some effect. Moreover, the very fact that the Act authorized an exception to the obligation to provide uncompensated care, if a facility was financially unable to furnish it, indicates that the Act contemplated that the hospital would be required to devote some of its own resources to fulfilling the assurances. *See* Rosenblatt, *Health Care Reform and Administrative Law: A Structural Approach,* 88 Yale L.J. 243, 267 (1978).

The only change in the statutory language describing these obligations occurred in 1964 when Congress amended the provision so as to eliminate both the clause allowing "separate but equal" facilities and the clause describing the community service obligation as an availability "without discrimination on account of race, creed or color." At that time, the Secretary argued for continued inclusion of the language about discrimination so as to limit the availability prescribed by the community service assurance to a ban on certain types of discrimination, but Congress specifically rejected the proposed limiting language. *See* Hearings on H.R. 10041 Before the House Comm. on Interstate and Foreign Commerce, 88th Cong., 2d Sess. 53–54, 67, 90–92 (1964).

The premise, assumed in 1945, that hospitals would voluntarily provide services to all residents, including the indigent, out of their history of charitable service, proved to be unjustified; their apparent failure resulted in litigation to enforce the federally assisted hospitals' community service and uncompensated care obligations in the early 1970s. *See, e.g., Corum v. Beth Israel*

---

**5.** It is commonly believed that the obligations were added as concessions to Senate "liberals" who had been unsuccessful in their attempt to include national health insurance in the proposed health package. Rose, *Federal Regulation of Services to the Poor under the Hill-Bur-* *ton Act: Realities and Pitfalls,* 70 Nw.U.L.Rev. 168, 170 (1975); Rosenblatt, *Health Care Reform and Administrative Law: A Structural Approach,* 88 Yale L.J. 243, 266 (1978); *cf.* Comment, *Due Process for Hill-Burton Assisted Facilities,* 32 Vand.L.Rev. 1469, 1478 (1979).

*Medical Center,* 359 F.Supp. 909 (S.D.N.Y. 1973); *Euresti v. Stenner,* 458 F.2d 1115 (10th Cir.1972); *Cook v. Ochsner Foundation Hospital,* 319 F.Supp. 603 (E.D.La. 1970). The regulations which were issued in 1972 and 1974 were to some extent a response to this litigation. For the first time, they set specific standards for compliance with the hospitals' obligations—standards which are in many respects similar to the ones embodied in the 1979 regulations at issue here.[6] *See* 42 C.F.R. §§ 53.111, 53.113 (1974).

Congress passed Title XVI in 1975, after the passage of the more stringent regulations under Title VI. The new act, which replaced the Hill-Burton program, contained language requiring assurances almost identical to those required by Title VI, but the 1975 provisions were mandatory upon the Secretary and supported by ample investigatory and enforcement mechanisms. *See* 42 U.S.C. §§ 300s–1(b)(1)(K), 300s–6. The Senate report indicates that the inclusion of these stronger provisions, and the extension of their application to facilities which had received funds under Title VI as well, was the result of a conviction that the Secretary, state agencies and health care facilities had all been deplorably lax in complying with the community service and uncompensated care obligations:

> ... the GAO report states that "the implementation of the free service requirement is in its infancy at the State agency and local facility level." It states that "while the State plans reviewed contained provisions which essentially met the Federal requirements, none of the State agencies had an active program for monitoring compliance with the requirement. Most intend to rely on complaints

to monitor compliance. Also, some facilities have not informed the State agencies how they intend to meet the reasonable volume of free services requirement." This seems to the Committee to be a sorry performance by the Department and the State Hill-Burton agencies in implementing a provision which has been in law for over 20 years, and which has recently been reemphasized.

Senate Comm. on Labor and Public Welfare, S.Rep. No. 1285, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.CODE CONG. & AD. NEWS 7842, 7900. Moreover, Congress reaffirmed its insistence upon compliance with the assurances in 1979, after the regulations before us had been passed.[7] *See* Senate *Comm. on Labor and Human Resources,* S.Rep. No. 96, 96th Cong., 1st Sess., *reprinted in* 1979 U.S.CODE CONG. & AD.NEWS 1306, 1396.

■ This rather detailed account of the legislative history of the provision before us provides abundant evidence that Congress—both in 1946 and in 1975—strongly intended that the words of the statutory assurances be given a practical reality, with the result that facilities receiving funds under the federally assisted programs would indeed "be made available to all persons residing in the territorial area of the applicant ... [including] a reasonable volume of services to persons unable to pay...." 42 U.S.C. § 291c(e). We hold, therefore, that the Secretary was acting within his statutorily prescribed authority in promulgating the 1979 regulations at issue here.

Having found that the Secretary was acting within the general scope of his statutory authority in issuing these regulations,

---

**6.** For example, the 1972 regulations included presumptive standards for annual compliance at a level of 3% of operating costs or 10% of assistance under the Act, 42 C.F.R. § 53.111(d); the 1974 regulations required facilities to participate in Medicare and Medicaid and not to exclude or discriminate against beneficiaries of those programs from medical services, 42 C.F.R. § 53.113(d) (1974).

**7.** "The committee wishes to reaffirm its previous position that services at facilities con-

structed or modernized, in whole or in part, with the aid of Federal funds under Title VI or Title XVI will, in fact, be accessible to all members of the community in which the facility is located, including (to the extent financially feasible) persons unable to pay.... Accordingly, the committee expects that the Secretary will implement and enforce compliance with these assurance [sic] as vigorously and expeditiously as possible." 1979 U.S.CODE CONG. & AD.NEWS 1306, at 1396.

our review is restricted to inquiring, in the first instance, whether the regulations violate any of the explicit statutory limits upon the scope of the facilities' obligations. As the district court noted, the only limitations upon the scope of the assurances which the Secretary was authorized to require are (1) that the persons to whom services must be made available are those who reside in the territorial area, (2) that the amount of services required be a "reasonable volume," (3) that the assurances apply only to the facility or portion thereof to be constructed or modernized and (4) that an exception to the uncompensated care requirement be made where it is financially infeasible for the health care provider to comply. *American Hospital Ass'n v. Schweiker,* 529 F.Supp. at 1288–89. Section 291m of Title VI also states that "[e]xcept as otherwise specifically provided, nothing in this subchapter shall be construed as conferring on any Federal officer or employee the right to exercise any supervision or control over the administration, personnel, maintenance, or operation of any facility. . . ." 42 U.S.C. § 291m. If we find that the regulations complained of do not violate any of these limitations, then our review under the Administrative Procedure Act is confined to inquiring whether they are arbitrary and capricious, 5 U.S.C. § 706(2)(A), (C); *Batterton v. Francis,* 432 U.S. at 426, 97 S.Ct. at 2406—or, affirmatively stated, whether they bear a rational relationship to the purposes of the statute, *Thorpe v. Housing Authority of the City of Durham,* 393 U.S. 268, 280–81, 89 S.Ct. 518, 525, 21 L.Ed.2d 474 (1969). We shall examine each of AHA's allegations under these standards.

### Compliance Levels

■ The AHA challenges the compliance levels set in 42 C.F.R. § 124.503(a) on several accounts. In most general terms, it is alleged that the percentages set forth by the Secretary do not define a "reasonable volume of services" within the meaning of the statute. The 10% of assistance figure is challenged as unreasonably high and the addition of both an inflation factor and of other federal assistance programs to the base amount upon which the 10% is calculated is attacked as arbitrary. The alternative compliance standard—3% of operating costs for the year—bears, the AHA argues, no rational relationship to the amount of funds borrowed, is entirely arbitrary and includes in its base costs related to parts of the facility unassisted by the Hill-Burton program. More generally, the AHA apparently also believes that the elimination of the "open door option" included in previous versions of the regulations exceeds the Secretary's authority.

There is ample support in the record for the conclusion that the "open door option" (under which an assisted facility would merely certify that it would not exclude persons from admission based on inability to pay) did not work. The records of the public hearings held on December 5–6, 1978, are replete with examples of persons turned away from Hill-Burton hospitals, of refusals to offer uncompensated services and of numerous administrative complaints involving hospitals that had selected the open door option.[8] In acting to restrict the hospitals to a choice of specified quantitative compliance levels, therefore, the Secretary was not only acting within his statutory authority to define what constituted a "reasonable volume of services" but was also responding to manifestations of Congressional discontent with past failure to monitor and enforce the statutory assurances. *See supra* at 178–179.

The Secretary's conclusion that it was necessary, in order to monitor compliance with the assurances, to rely on some finite measure of the "reasonable volume of services" required is rationally related to the statutory goal of assuring access by the indigent to the federally assisted facilities. In determining the precise level which reflects that "reasonable volume," this court may not substitute its own idea of reasona-

---

8. *See, e.g.,* December 5, 1978 Hearing, Record at 27–32, 43–45, 76–85; December 6, 1978 Hearing, Record at 131, 133–36, 161–67, 186–87, 263–65, 297–98.

bleness for that of the agency unless the regulation is clearly inconsistent with the purposes of the Hill-Burton Act. *Lugo v. Simon,* 426 F.Supp. 28, 35 (N.D.Ohio 1976). We find no such inconsistency here.

Appellants' arguments to the contrary appear to be based upon a conception of the Hill-Burton program as a relationship between the hospital as a private debtor and the government as a commercial lender entitled merely to a market rate of return upon capital. Thus they complain about the addition of an inflation factor to the 10% of assistance level and the inclusion of other federal assistance in the base amount, or, alternatively, about the use of operating costs of the entire facility rather than of the assisted portion alone. But the 1946 program was not simply a commercial lending transaction; rather, it was a program, having broad public implications, under which Congress extended aid for the construction of hospitals and expected those hospitals in return to offer services to all the residents in their communities, including those who were indigent. When this expectation was not met, percentage compliance amounts were established. But those amounts, it is important to remember, do not constitute a loan repayment schedule;[9] they are instead a rough means of monitoring compliance with the obligation to provide uncompensated care. Objections based upon inclusion of other federal programs or of total operating costs in the base amount, within the limits presented here, are not persuasive. Moreover, the inflation factor is a rational means of preserving a real dollar amount as a reasonable measure of the *volume of services* which the facilities are expected to provide. It is the actual amount of services provided, in short, that is the indicator of compliance with the facilities' assurances—and not the nominal dollar cost or value of those services. Since

we are not persuaded that the presumptive compliance levels are an unreasonable method to measure that compliance, we must uphold the presumptive compliance regulations.

*Denial of Credit for Medicaid "Shortfall"*

■ As a related matter, the AHA challenges the regulation codified at 42 C.F.R. § 124.509(b), which prohibits hospitals from crediting against their uncompensated care obligation the difference between the cost of care for a patient and the amount actually reimbursed under the Medicaid program, which may be less than actual cost. We note, first of all, that the regulation which mandates participation in the Medicare and Medicaid programs by all Hill-Burton hospitals, 42 C.F.R. § 124.603(c), not only is virtually identical to that contained in the earlier regulations, *see* 42 C.F.R. § 53.-113(d)(2), but also represents a codification of case law under the community service obligation. *Cook v. Ochsner Foundation Hospital,* 61 F.R.D. 354, 359–60 (E.D.La. 1972). Moreover, as we recently said with respect to the relationship between the Medicare Act and the Hill-Burton Act—a relationship similar in this regard to that between the Hill-Burton and Medicaid Acts—the two are separate and distinct federal programs with distinct goals and obligations. *St. Mary of Nazareth Hospital Center v. Department of Health and Human Services,* 698 F.2d 1337, 1343 (7th Cir. 1983). The fact that reimbursement under the Medicaid program may fall short of cost is a problem that Hill-Burton hospitals share with all other hospitals participating in Medicaid. It is neither reasonable nor just that Hill-Burton hospitals should fare better in relation to this problem than do hospitals which have received no federal assistance under the program.[10]

9. Of course, there is no showing that adequate funds would have been available from private sources in lieu of the Hill-Burton program. In addition, the Secretary contends that, "The financial burden of providing uncompensated services amounting to 10 percent of federal assistance received for twenty years is the same as the burden of repaying a loan over

twenty years at 7¾ percent interest, without some of the major risks a loan would ordinarily entail for the borrower." Secretary's Brief at 21 n. *.

10. If the shortfall were permitted to be credited against the Hill-Burton obligation, the credit could (and the Secretary argues that it proba-

*The Exception for Financial Infeasibility*

The AHA argues that the 1979 regulations violate the statutorily mandated exception for financial infeasibility by deferring rather than waiving compliance with the uncompensated care obligation for the year when the facility is financially unable to comply. 42 C.F.R. § 124.503(b). The exact nature of the financial infeasibility exception, however, is unclear from the language of the statute, which appends the phrase "but an exception shall be made if such a requirement is not feasible from a financial viewpoint" to the provision authorizing the Secretary to require the "assurances" from all applicants for aid. 42 U.S.C. § 291c(e). The Secretary argues that this exception applies only at the point of the initial application and grant. Without deciding this question, we do note that the statute does not mandate a total waiver of the uncompensated care obligation when a facility is unable to pay. The 1979 regulations instead deal with financial infeasibility by allowing the facility to defer compliance with the uncompensated care assurance until it is financially able to provide the care required. We cannot say that this is an arbitrary method of dealing with the issue; indeed, it seems eminently fair to the recipients of the aid, allowing them to extend repayment of their obligation without penalty.

The AHA further argues that thus to extend the obligation violates the 20-year limitation on the Hill-Burton uncompensated care obligation. This 20-year limitation is not explicitly incorporated in the statute,[11] but was judicially engrafted onto it as representing a reasonable period of time over which to require the provision of uncompensated services, as measured by the compliance standards included in the 1972 regulations. *Lugo v. Simon,* 426 F.Supp.

28, 35 (N.D.Ohio 1976).[12] These standards were expressed as percentages which were virtually identical to those in the 1979 regulations before us. If a facility provides uncompensated care in that volume, the deficit carry-over provision will not extend the obligation beyond twenty years; it is only a repeated failure to comply which will have that effect. Thus the 20-year durational limit is just a part of the formula for measuring a reasonable *volume* of services in terms of a certain percentage of assistance or of costs over a finite period of time. If a facility is financially unable to meet this obligation in any year, allowing an open-ended period during which to render the services ensures that a "reasonable volume of services" will be provided over time—at a rate possible for the individual facility. We cannot say that this arrangement is an unreasonable way to implement the financial infeasibility exception. We therefore uphold the deficit carry-over provision embodied in 42 C.F.R. § 124.503(b).

*Prohibition of Exclusionary Admissions Policies*

The AHA argues that the various regulations affecting hospital admissions policies violate the statutory prohibition against federal control over the administration and operation of hospitals and the conduct of physicians. *See* 42 U.S.C. § 291m. The particular regulations under challenge in this respect are those which prohibit certain admissions policies having the effect of excluding persons on impermissible grounds: exclusion of patients who do not have a doctor with staff privileges, exclusion of Medicaid patients because few or none of the staff physicians treat Medicaid patients and the requirement of a pre-admission deposit. 42 C.F.R. § 124.603(d). If these policies should apply, the regulations require that an assisted facility make other

---

bly would) swallow up the uncompensated care obligation entirely.

**11.** There is a 20-year limit upon the period during which the government may recover a portion of the aid if the hospital is sold to a person not eligible for Hill-Burton assistance or ceases to be a non-profit institution, 42 U.S.C.

§ 291i; but this recapture provision has little relevance to the duration of the Hill-Burton facilities' assurances.

**12.** The community service obligation, on the other hand, is perpetual. *Lugo v. Simon,* 426 F.Supp. at 36.

arrangements so that individuals excluded by these policies may be treated; various alternatives are suggested, such as referrals to physicians on the staff, establishing a clinic or extending temporary privileges to non-staff physicians. However, the alternatives are offered only as suggestions; the only mandate is the prohibition of certain practices if their effect is exclusionary.

We find the argument that such a prohibition constitutes supervision or control over the administration of a hospital to be most implausible. The practices in question are cause for concern only if their effect is exclusion on impermissible grounds of persons needing medical care. If exclusion is the result, the hospitals must make other arrangements, but no particular solution is imposed. To the extent that these prohibitions circumscribe freedom of the facilities to run their affairs entirely as they wish, we note that the restriction in Section 291m upon such interference is qualified by the phrase "[e]xcept as otherwise specifically provided." 42 U.S.C. § 291m. Section 291c(e), which requires that assisted facilities be made available to all residents, is just such a specific exception. *Wyoming Hospital Ass'n v. Harris,* 527 F.Supp. 551, 560 (D.Wyo.1981). We conclude that the challenged regulation, 42 C.F.R. § 124.-603(d), does not violate the statutory prohibition contained in 42 U.S.C. § 291m. Since there is, moreover, abundant evidence in the record that the three prohibited practices did in fact prevent many otherwise eligible persons from receiving care at Hill-Burton facilities,[13] we cannot set these provisions aside as arbitrary and capricious.[14]

### III

We turn now to the contractual and constitutional challenges to the 1979 regulations. The AHA alleges that the regulations impermissibly impair the assisted hospitals' contractual rights by adding conditions to which the hospitals did not assent at the time they entered into their agreements with the government; this impairment of contract rights and retroactive alteration of the hospitals' obligations, according to the AHA, constitute a violation of the facilities' rights under the due process clause of the Fifth Amendment. Since these two arguments are closely related, we will deal with them together.

In support of their argument based on impairment of contract rights, the AHA cites to us, first, cases standing for the proposition that the United States government must honor the terms of the contracts into which it has entered. *See, e.g., Lynch v. United States,* 292 U.S. 571, 580, 54 S.Ct. 840, 844, 78 L.Ed. 1434 (1934). With respect to this argument, we note, first of all, that the relationship between the government and the hospitals here cannot be wholly captured by the term "contract" and the analysis traditionally associated with that term. Rather than a voluntary agreement negotiated between two parties, a grant-in-

---

**13.** *See, e.g.,* December 5, 1978 Hearing, Record at 17–26, 308–14; December 6, 1978, Hearing, Record at 129–30, 157–59.

**14.** The AHA also argues that the regulations impermissibly extend the Hill-Burton hospitals' obligation to the entire facility by dictating admissions policies applicable to the entire facility and by requiring the provision of emergency services in the unassisted portions of the facility. These arguments seem to be based on an erroneous assumption that the regulations require more than they actually do. The regulations, including the prohibition on exclusionary admissions policies and governing the provision of emergency services, explicitly include the statement that the facility must make the services available "in the facility or portion thereof constructed." 42 C.F.R. § 124.-

603(a)(1). Provision of emergency services according to the source of construction funds for the particular area which proves to be required by the patient may also simply not be feasible. The AHA argues, in addition, that the facilities' obligations are extended beyond the assisted portion by using the operating costs of the entire facility as the base amount for the 3% compliance level. However, the computation of the 3% compliance level upon total operating costs has nothing whatever to do with the portion of the hospital in which services are to be provided. If the amount of federal assistance is small, moreover, in relation to operating costs of the entire facility, the hospital may, and probably will, elect the 10% of assistance compliance level, since it will be the lesser of the two alternatives.

aid program like that under the Hill-Burton Act is an exercise by the federal government of its authority under the spending power to bring about certain public policy goals. The government acts by inducing a state or private party to cooperate with the federal policy by conditioning receipt of federal aid upon compliance by the recipient with federal statutory and administrative directives. *See Fullilove v. Klutznick,* 448 U.S. 448, 474, 100 S.Ct. 2758, 2772, 65 L.Ed.2d 902 (1980). The "conditions" of this arrangement are not the result of a negotiated agreement between the parties but rather are provided by the statute under which the program is administered. Determination of statutory intent, therefore, is of more relevance to the interpretation of these conditions than is an inquiry into the intent of the two parties at the moment of the initial agreement. The contract analogy thus has only limited application.

Moreover, there is case law arising out of litigation engendered by the vast growth of governmental regulatory activity in the 1930s and thereafter, which provides precedents strongly supporting the government's right, when undertaking a regulatory scheme, to alter the expectations and obligations of private parties. *See, e.g., FHA v. The Darlington, Inc.,* 358 U.S. 84, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958); *Thorpe v. Housing Authority of the City of Durham,* 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969); *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976). To the extent that such regulation is considered to be "retroactive," [15] these cases nonetheless uphold its constitutionality.

Rejecting these precedents, the AHA instead relies heavily upon certain language in *Pennhurst State School & Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981):

> [L]egislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the "contract." There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.

451 U.S. at 17, 101 S.Ct. at 1539 (citations omitted). But *Pennhurst* is quite different from the case at hand. *Pennhurst* addressed the question whether a new federal statute—the "bill of rights" provision of the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. § 6010(1) and (2), which involved federal grants to assist participating states create programs for the developmentally disabled, conferred an enforceable substantive right upon mentally retarded persons. *Id.* at 5, 101 S.Ct. at 1534. The case before us, on the other hand, involves not *whether* enforceable obligations were created by the Hill-Burton Act—that is conceded—but rather the scope and interpretation of those obligations. Again, this question is one more of statutory construction than of contract law.

Even assuming for the moment the contractual nature of the obligations at issue here, and the applicability of the *Pennhurst* principles to them, we conclude without difficulty that the 1979 regulations do not violate those principles. The "contracts" entered into here consisted not only of the forms signed by the applicants for aid (on which general statements of the assurances were printed) but also of the statutory obligation under 42 U.S.C. § 291c(e). *See Euresti v. Stenner, supra,* 458 F.2d at 1118. Understanding the contract as incorporating the statutory terms, it is plain that the conditions imposed upon recipients of Hill-Burton aid were unambiguously stated: (1) they were required to make the facilities available to all persons residing in the area

---

**15.** The regulations here are, in a strict sense, prospective, in that they apply only to the unexpired years of any hospital's 20-year obligation.

and to furnish necessary services to persons unable to pay, 42 U.S.C. § 291c(e); (2) the Secretary was authorized to issue general regulations requiring assurances that the facilities would comply with these two obligations, if they were financially able to do so, 42 U.S.C. § 291c(e); and (3) the applicants were required to comply with whatever regulations were issued pursuant to section 291c, 42 U.S.C. § 291e(b). Thus, in consideration of the federal financial assistance, the recipients agreed to a substantial amount of federal regulation and, in particular, to provide adequate services to their respective communities, including uncompensated care, while the right to specify the measure of these obligations was conferred upon the Secretary. In short, the applicants for Hill-Burton funds signed a very open-ended "contract," one which conferred a great deal of discretion upon the Secretary to define the precise measure of their obligations under it.

The situation in the case before us is, we think, almost an exact parallel to that in *The Darlington, supra.* In that case, the appellee corporation had obtained FHA mortgage insurance in 1949 to construct an apartment house; when the 1954 Housing Act prohibited the rental of this housing to transients, the corporation sued the FHA. The Supreme Court found that this restriction on the use of the property, although not contained in the 1946 statute under which the aid had been sought and received, was nonetheless within the purpose of that statute, was consistent with administrative construction of the act and was also within the construction placed upon the prior act by a subsequent Congress. Thus the 1954 provision was held to be constitutional in its application to persons who had received mortgages under the prior statute. 358 U.S. at 90–91, 79 S.Ct. at 145–46. In passing the later statute, the Court concluded, Congress was merely "protecting the regulatory system which it had designed." 358 U.S. at 91, 79 S.Ct. at 146. Such an analysis has also been explicitly applied to regulations issued pursuant to statutes as well as to subsequent statutory provisions. *See Thorpe v. Housing Authority of the City of*

*Durham,* 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969).

*The Darlington* is directly on point here, where we have found the 1979 regulations to have been within the purpose of the Hill-Burton Act as well as within the interpretation of it by a later Congress. *See supra* at 176–180. Nor can the appellants be said to have gained any vested rights arising during the years in which the Hill-Burton obligations were laxly enforced by the Secretary. In the words of *The Darlington* Court:

> Those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end.

358 U.S. at 91, 79 S.Ct. at 146. We find, therefore, that no rights of the appellants, protected either under contract or under the due process clause, have been violated by the promulgation and enforcement of the 1979 regulations. The judgment of the district court is therefore AFFIRMED.

### APPENDIX

#### Subpart F—Reasonable Volume of Uncompensated Services to Persons Unable to Pay

\* \* \* \* \* \*

### § 124.503 Compliance level.

(a) *Annual compliance level.* (1) A facility is in compliance with its assurance to provide a reasonable volume of services to persons unable to pay if it provides for the fiscal year uncompensated services at a level not less than the lesser of—

(i) Three percent of its operating costs for the most recent fiscal year for which an audited financial statement is available; or

(ii) Ten percent of all Federal assistance provided to or on behalf of the facility, adjusted by a percentage equal to the percentage change in the national Consumer Price Index for medical care between the year in which the facility received assistance or 1979, whichever is later, and the most recent year for which a published In-

APPENDIX—Continued

dex is available. For purposes of this paragraph, the Federal assistance in the case of a loan which is guaranteed or made and sold by the Secretary will be deemed to have been provided in the year in which the Secretary made the loan.

(b) *Deficit in compliance*—(1) *Facilities assisted under Title VI*—If in any fiscal year a facility assisted under Title VI of the Act fails to meet its annual compliance level, it shall provide uncompensated services in an amount sufficient to make up that deficit (as adjusted under paragraph (d)). The facility may make up a deficit at any time during its period of obligation or in the year or years (if necessary) immediately following, except where the facility failed to provide uncompensated services at the required level although financially able to do so, or where the facility did not comply with the requirements of this subpart.

(2) *Facilities assisted under Title XVI.* If in any fiscal year a facility assisted under Title XVI of the Act fails to meet its annual compliance level but has otherwise complied with the requirements of this subpart, the amount of uncompensated services provided in that year constitutes compliance with this subpart.

(c) *Excess compliance.* (1) Whenever a facility provides in a fiscal year uncompensated services in an amount exceeding its annual compliance level, it may apply the amount of excess (as adjusted under paragraph (d)) to reduce its annual compliance level in any subsequent fiscal year. The facility may use any excess amount to reduce its annual compliance level only if the services in excess of the annual compliance level are provided in accordance with the requirements of this subpart.

(2) A facility assisted under Title VI may in any fiscal year apply the amount of excess credited under this paragraph to satisfy the remainder of its obligation to provide uncompensated services. In any fiscal year, the amount of uncompensated services required to satisfy the remainder of the facility's obligation is its annual compliance level for that fiscal year provided multiplied by the number of years remaining in its period of obligation, plus any deficits required to be made up under this section.

(d) *Calculation and adjustment of deficit and excess.* (1) The amount of a deficit or excess in uncompensated services in any fiscal year is the difference between the facility's annual compliance level for that year and the amount of uncompensated services the facility provided in that year.

(2) The amount of any deficit the facility makes up, and the amount of any excess compliance applied to reduce a facility's annual compliance level, must be adjusted by a percentage equal to the percentage change in the National Consumer Price Index for medical care between the fiscal year in which the facility had a deficit or provided the excess, and the fiscal year in which the facility makes up the deficit or applies the excess to reduce its annual compliance level or satisfy its remaining obligations.

\* \* \* \* \* \*

## § 124.509 Exclusions from uncompensated services.

A facility may not include the following in computing the uncompensated services it provides:

(a) Any amount that the facility has received, or is entitled to receive, from a third party insurer or under a governmental program, except where the person to whom the facility provides services refused to take reasonable actions necessary to obtain the entitlement.

(b) Any amount in excess of the payment that the facility has received, or is entitled to receive, from a third party insurer or under a governmental program where the facility has agreed or is otherwise required to accept this payment as payment in full for the services;

(c) Any amount for services provided 96 hours or more following notification to the facility by a professional standards review organization (PSRO) that the PSRO disapproved the services under section 1155(a)(1) of the Social Security Act; and

APPENDIX—Continued

(d) Any amount for which reimbursement would be available under a governmental program (such as medicare or medicaid) in which the facility, although eligible to do so, and required by § 124.603(c)(1) to do so, does not participate.

\* \* \* \* \* \*

### Subpart G—Community Service

\* \* \* \* \* \*

#### § 124.603 Provision of services.

(a) *General.* (1) In order to comply with its community service assurance, a facility shall make the services provided in the facility or portion thereof constructed, modernized, or converted with Federal assistance under Title VI or XVI of the Act available to all persons residing (and, in the case of facilities assisted under Title XVI of the Act, employed) in the facility's service area without discrimination on the ground of race, color, national origin, creed, or any other ground unrelated to an individual's need for the service or the availability of the needed service in the facility. Subject to paragraph (b) (concerning emergency services) a facility may deny services to persons who are unable to pay for them unless those persons are required to be provided uncompensated services under the provisions of Subpart F.

\* \* \* \* \* \*

(c) *Third party payor programs.* (1) The facility shall make arrangements, if eligible to do so, for reimbursement for services with:

(i) Those principal State and local governmental third-party payors that provide reimbursement for services that is not less than the actual costs, as determined in accordance with accepted cost accounting principles; and

(ii) Federal governmental third-party programs, such as medicare and medicaid.

(2) The facility shall take any necessary steps to insure that admission to and services of the facility are available to beneficiaries of the governmental programs specified in paragraph (c)(1) of this section without discrimination or preference because they are beneficiaries of those programs.

(d) *Exclusionary admissions policies.* A facility is out of compliance with its community service assurance if it uses an admission policy that has the effect of excluding persons on a ground other than those permitted under paragraph (a) of this section. Illustrative applications of this requirement are described in the following paragraphs:

(1) A facility has a policy or practice of admitting only those patients who are referred by physicians with staff privileges at the facility. If this policy or practice has the effect of excluding persons who reside (or for Title XVI facilities, are employed) in the community from the facility because they do not have a private family doctor with staff privileges at the facility, the facility would not be in compliance with its assurance. The facility is not required to abolish its staff physician admissions policy as a usual method for admission. However, to be in compliance with its community service assurance it must make alternative arrangements to assist area residents who would otherwise be unable to gain admission to obtain services available in the facility. Examples of alternative arrangements a facility might use include:

(i) Authorizing the individual's physician, if licensed and otherwise qualified, to treat the patient at the facility even though the physician does not have staff privileges at the facility;

(ii) For those patients who have no physician, obtaining the voluntary agreement of physicians with staff privileges at the facility to accept referrals of such patients, perhaps on a rotating basis;

(iii) If an insufficient number of physicians with staff privileges agree to participate in a referral arrangement, requiring acceptance of referrals as a condition to obtaining or renewing staff privileges;

(iv) Establishing a hospital-based primary care clinic through which patients needing hospitalization may be admitted; or

APPENDIX—Continued

(v) Hiring or contracting with qualified physicians to treat patients who do not have private physicians.

(2) A facility, as required, is a qualified provider under Title XIX medicaid program, but few or none of the physicians with staff privileges at the facility or in a particular department or sub-department of the facility will treat medicaid patients. If the effect is that some medicaid patients are excluded from the facility or from any service provided in the facility, the facility is not in compliance with its community service assurance. To be in compliance a facility does not have to require all of its staff physicians to accept medicaid. However, it must take steps to ensure that medicaid beneficiaries have full access to all of its available services. Examples of steps that may be taken include:

(i) Obtaining the voluntary agreement of a reasonable number of physicians with staff privileges at the facility and in each department or sub-department to accept referral of medicaid patients, perhaps on a rotating basis:

(ii) If an insufficient number of physicians with staff privileges agree to participate in a referral arrangement, requiring acceptance of referrals as a condition to obtaining or renewing staff privileges;

(iii) Establishing a clinic through which medicaid beneficiaries needing hospitalization may be admitted; or

(iv) Hiring or contracting with physicians to treat medicaid patients.

(3) A facility requires advance deposits (pre-admission or pre-service deposits) before admitting or serving patients. If the effect of this practice is that some persons are denied admission or service or face substantial delays in gaining admission or service solely because they do not have the necessary cash on hand, this would constitute a violation of the community service assurance. While the facility is not required to forego the use of a deposit policy in all situations, it is required to make alternative arrangements to ensure that persons who probably can pay for the services are not denied them simply because they do not have the available cash at the time services are requested. For example, many employed persons and persons with other collateral do not have savings, but can pay hospital bills on an installment basis, or can pay a small deposit. Such persons may not be excluded from admission or denied services because of their inability to pay a deposit.