Ella ARMSTRONG, The South Central Minnesota Senior Federation, and the Fairmont Hospital Medicare and Medical Assistance Certification Coalition, Plaintiffs,

v.

FAIRMONT COMMUNITY HOSPITAL ASSOC., INC., the City of Fairmont, and Gerry Gilbertson in his official capacity as administrator of Fairmont Community Hospital Assoc., Inc., Defendants.

Civ. No. 4–86–416.

United States District Court,
D. Minnesota,
Fourth Division.

May 14, 1987.

Maureen O'Connell, Southern Minnesota Regional Legal Services, Inc., St. Paul, for plaintiffs.

John E. Diehl, Larkin, Hoffman, Daly & Lindgren, Ltd., Minneapolis, for defendants.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This matter is before the Court on plaintiffs' motion for summary judgment and defendants' cross motion for summary judgment. Plaintiffs' motion will be granted. Defendants' cross motion will be denied.

## FACTS

Plaintiff Ella Armstrong is a 91–year old resident of the Fairmont Community Hospital nursing facility (the Lutz Wing) in Fairmont, Minnesota who has exhausted her personal resources and is eligible for, and receives (as of July 1, 1986), Medicaid to pay for her nursing home care. Plaintiff South Central Minnesota Senior Federation, located in Mankato, Minnesota, is a non-profit corporation representing 4,000 senior citizen members in a nine-county area including the City of Fairmont. The Federation's stated purpose is to improve the quality of life for older persons by eliminating economic injustice and providing retirement with health, honor and dignity by, among othere things, advocating on behalf of low-income elderly persons in need of nursing home care. Plaintiff Fairmont Hospital Medicare and Medical Assistance Certification Coalition, located in Fairmont, Minnesota, was formed in February 1984 by 35 Fairmont area residents to seek Medicare and Medicaid participation by the Fairmont Community Hospital nursing home.

Defendant Fairmont Community Hospital Association, Inc. is a non-profit, tax-exempt charitable corporation organized and operated under Minn.Stat. 317 and doing business in the City of Fairmont, Martin County, Minnesota. The hospital operates a nursing home (the Lutz Wing) providing long-term nursing care and other services to persons requiring varying levels of nursing care, including skilled nursing care. Defendant City of Fairmont is a Minnesota municipal corporation located in Martin County, Minnesota. Defendant Gerry Gilbertson is the administrator of the Fairmont Community Hospital and as such is responsible for the hospital's Medicaid certification.

Jurisdiction is pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). An administrative complaint was filed with the Department of Health and Human Services' Office for Civil Rights on September 9, 1985 by plaintiffs, seeking to compel defendants' compliance with the Hill-Burton law obligations of Medicaid certification. However, the Secretary of HHS did not bring a compliance action within six months from the date plaintiffs' complaint was filed. Therefore, under 42 C.F.R. §§ 124.601–.607 plain-

tiffs were authorized to bring their claims in federal court.

This case arises out of a series of events which began on or about June 6, 1969. At that time, defendant City of Fairmont submitted an application for project construction to the Department of Health, Education and Welfare, Public Health Service, on behalf of the Fairmont Community Hospital. The application sought a federal grant of $1,177,872.79 for construction and modernization of the hospital, to be used specifically for 75 acute care general hospital beds and for the 40–bed extended care convalescent and nursing home facility at issue in the case at bar. Plaintiffs' Exh. A. The application was signed by the mayor of Fairmont, W. Lester Webb, on behalf of the city and the hospital. The application contained a provision assuring that in return for the federal funding, defendants would provide "a community service" and that this assurance was ". . . binding on the Applicant, its successors, transferees, and assignees, and the person or persons whose signatures appear below are authorized to sign this assurance on behalf of the Applicant." *Id.*

The number of skilled nursing home beds in Martin County by the early 1970's was approximately 28 percent below the state average, and therefore, at the request of the local community in Fairmont, the 40–bed nursing home unit received special priority for federal Hill-Burton funding, with the understanding that the nursing home would serve as a demonstration project in the area. Hill-Burton funds for long-term nursing home care facilities were extremely limited in amount at the time. Plaintiffs' Exh. B. Hill-Burton funding was approved and the remodeled/reconstructed facilities were put into use by late 1972. Plaintiffs' Exh. A.

However, by April of 1973 the hospital was already in non-compliance with the terms of its Hill-Burton funding to provide skilled nursing home care. The Minnesota State Department of Health stated in a letter to Congressman Ancher Nelsen, dated October 23, 1973 that:

Information from the hospital shows that there has been an excessive number of hospital patients with a length of stay of over 30 days. There has been resistance to using the Unit for skilled nursing home patients even though there is a shortage of skilled nursing home beds in the community and the physicians frequently send hospital discharged patients to skilled nursing facilities in other counties.

If the 40 bed C & NC Unit in Fairmont were to be licensed for acute hospital beds, Martin County would have a bed-population ratio nearly 10% above the current State average. It would require a great deal of documentation to show that this would be desirable. This is particularly true since most communities are showing an excess of hospital beds as a result of the close scrutiny of admissions and the utilization review process. On the other hand, the number of skilled nursing home beds in Martin County was 28% below the State average in 1972. If the 40 C & NC Unit beds in Fairmont were used for skilled patients, Martin County would have a bed/1,000 ratio for people aged 65 plus which would be only 1% below the State average.

In view of the current social imperatives to increase accountability and exercise cost constraints in hospital services, Fairmont Hospital should strengthen its utilization review function. The number of over 30 day length of stays should be reviewed.

Plaintiffs' Exh. B.

At the urging of the Minnesota State Department of Health, the hospital agreed to seek Medicare and Medicaid certification from the Department so that elderly recipients of Medicare-Medicaid could utilize the hospital's nursing home facility. The facility was certified to receive Medicare-Medicaid reimbursements for skilled nursing care in September of 1973. However, by letter dated June 17, 1974 the hospital threatened to voluntarily withdraw its nursing home facility from Medicare/Medicaid participation, stating:

Regarding the reply to our anticipation of corrections of deficiencies as listed in our recent S.N.F. inspection, we have now been informed by our Medical Staff that utilization review will be done at the

30 day level. They do not consent to the recent change of doing this review at the 21 day level.

If the requirement of doing utilization review at 21 days cannot be waived, then ... the only alternative left is to drop from S.N.F. participation in the Medicare-Medicaid programs.

Please advise the procedures required to decertify if the regulation cannot be waived.

Plaintiffs' Exh. D. The Department of Health refused to waive the 21–day utilization review requirement, and on or about October 1, 1974 the hospital was terminated as a provider in the Medicare/Medicaid program for nursing home care. The hospital continued to participate in the program for its general hospital services, however. *See* Gilbertson Aff. The Department of Health classified the hospital's withdrawal of its nursing home facility from the Medicare-Medicaid program as "voluntary," *see, e.g.*, Plaintiffs' Exh. F and G, although defendants assert that the facility was "dropped" from the program by the Department of Health because it was unable to comply with regulations. At any rate, the nursing home facility did not participate in the Medicare/Medicaid program for at least ten years after its 1974 withdrawal.

Federal funding for projects such as the one involved in this case is authorized by the Hospital Survey and Construction Act, Pub.L. No. 79–725, 60 Stat. 1040 (1946), presently codified as Title VI of the Public Health Service Act, 42 U.S.C. § 291, and popularly known as the Hill-Burton Act. The purpose of this act is:

> to assist the several States in the carrying out of their programs for the construction and modernization of such public or other non-profit community hospitals and other medical facilities as may be necessary, in conjunction with existing facilities, to furnish adequate hospital, clinic, or similar services to all their people....

42 U.S.C. § 291. The Act works as follows: states requesting Hill-Burton funding assistance submit a state plan to the Surgeon General, outlining how the state plan implements the congressional purpose of the Act. 42 U.S.C. § 291d. State plan requirements are set forth in 42 U.S.C. § 291c(e) and provide that the state plan:

> may also require that before approval of the application for a project is recommended by a State agency to the Surgeon General for approval under this part, assurance shall be received by the State from the applicant that (1) the facility or portion thereof to be constructed or modernized will be made available to all persons residing in the territorial area of the applicant; and (2) there will be made available in the facility or portion thereof to be constructed or modernized a reasonable volume of services to persons unable to pay therefor, but an exception shall be made if such a requirement is not feasible from a financial viewpoint.

These two assurances have become popularly known as the "community service assurance" and the "uncompensated care assurance."

The Minnesota State Plan for Hospitals, Public Health Centers and Related Medical Facilities, Chapter I, § H, requires that applicants who receive a federal construction grant under the Hill-Burton law to construct a facility are required to effectively use that facility for the purposes for which it was constructed. A community services assurance given in an application for project construction sets forth one of the purposes of Hill-Burton funded construction projects, *i.e.*, to make the facility available to all persons residing in the community. Under the Minnesota State Plan, applicants are prohibited from converting or using a Hill-Burton funded project for a purpose different than that approved in the grant application, including use of the facility which is contrary to the community services assurance given in the application.

However, the Hill-Burton Act itself did not enact specific regulations explaining what constitutes "community service" under the Act until 1979. Essentially, the 1979 regulations promulgated under the Hill-Burton Act require that federally-assisted health facilities be made available to all residents of the community served by

the hospital, and prohibit the denial of services to any such resident on any factor unrelated to need. 42 C.F.R. § 124.603. Specifically, the 1979 regulations require that:

The facility shall make arrangements, if eligible to do so, for reimbursement for services with:

. . . .

(ii) Federal governmental third-party programs, such as medicare and medicaid.

42 C.F.R. § 124.603(c)(1). The 1979 regulations further require the facility to insure that admission to and services by the facility are available to Medicare-Medicaid beneficiaries without discrimination or preference based upon receipt of such benefits. 42 C.F.R. § 124.603(c)(2).

Defendant Gilbertson, who has been the Fairmont Community Hospital administrator since July 1985, claims that the hospital does provide extensive community services which fulfill the Hill-Burton requirements, even without participation in the Medicare-Medicaid program. Gilbertson lists the following community services as example of this:

(a) Direct Patient Service: At all times since it opened in 1972, the hospital has never turned away any patients seeking services because of inability to pay, neither the hospital nor the Lutz Wing have ever denied admission because of one's age, sex, race, or religion, and the hospital has provided extensive free care. In addition, the institution is the primary provider of mental health services for the indigent under a contract with the three (3) counties surrounding Fairmont.

(b) Community Health Care Services: Through its staff pathologist, the institution provides, without charge, autopsies for anyone requesting such service (which generally relates to the medical community in the institution's service area), and maintains cardiac rehabilitation services for the community at large.

(c) Community Education: The institution provides, in the public schools and with local service organizations, without charge, educational programs on such matters as well baby care, mental health

and coping with stress, and provides C.P.R. training to the general public.

(d) Professional Education: Fairmont Community Hospital Association, Inc., also serves the community through the training of health care professionals. This includes the provision of clinical education for certificate candidates as R.N.s, L.P.N.s, and Nurses Aids from the Iowa Lakes Nursing Program based in Emmetsburg, Iowa (which involves some eighty (80) classes per year), continuing education programs for nurses from throughout the region, and training for Emergency Medical Technicians from the three (3) county area.

(e) Support of Other Community Hospitals: Fairmont also provides a variety of management consultation, and direct clinical services (such as radiology services) to the hospitals in the surrounding area, which literally keeps these institutions viable to serve their communities.

Gilbertson Aff. ¶ 9. Defendants argue that these services fulfilled the Hill-Burton requirements up until the changed regulations in 1979 at least. However, it should be noted that none of these services cited directly apply to the Hill-Burton funded *nursing home care facility*, and that the hospital's non-participation in Medicare-Medicaid for nursing home facility patients has resulted in private paying residents of the nursing care facility being forced to transfer to other nursing homes once their personal resources are exhausted and the patients require Medicaid benefits to fund further nursing home care. *See* Gratz Aff., Plaintiffs' Exh. S; Linton Aff., Plaintiffs' Exh. T. Moreover, Martin County Human Services has reported that from January 1984 through April 1986, at least five community residents sought Medicaid benefits to pay for care in the hospital's nursing home facility but could not be placed in that facility because defendant hospital was not certified to accept Medicaid. *See* Plaintiffs' Exh. R.

Meanwhile, in 1976, Minnesota passed a law prohibiting facilities such as the Fairmont hospital's nursing home facility from charging private paying patients different amounts than the rates set by the state for

Medical Assistance patients in nursing homes. Then, in 1983, Minnesota passed a moritorium on certification of additional hospital beds for Medical Assistance programs. These state laws had the obvious effect of worsening the nursing care bed shortage in Southern Minnesota for increasing numbers of elderly residents in need of such facilities.

In light of the above situation, plaintiff Fairmont Certification Coalition met with defendant hospital's board of directors on several occasions in 1984 to petition the hospital to voluntarily seek Medicare and Medicaid certification for its nursing home facility. On or about August 15, 1984 the hospital's board voted to seek Medicare and Medicaid certification for the nursing home facility, and on or about September 11, 1984 an application for such certification was filed with the Minnesota Department of Health. Plaintiffs' Exh. H. Despite the state moritorium on certification, the Minnesota Department of Health made the following determination in August of 1985:

> After conversations in July with the Minnesota Department of Health and Human Services Board of Fairbault, Martin, and Watonwan Counties, it was decided that May 1, 1985, should be the official certification date for Medical Assistance (Title XIX). The reason for the delay in proceeding with the certification was due to the moritorium. *Although not allowed as an exception to the moritorium, it was determined that the Hill-Burton ruling took precedence.* Accordingly, the Minnesota Department of Health, certified Fairmont Community Hospital, C & NC as a Title XIX facility on August 2, 1985, retroactive to May 1, 1985.

Plaintiffs' Exh. L (emphasis added).

However, in August 1985, the same month the Department of Health notified the hospital of its certification for its nursing home facility, the hospital refused to submit the information necessary to complete its enrollment in the Medicare-Medicaid program. Charlene Seavey, supervisor of the utilization control unit of the Department of Health, informed plaintiffs' counsel that:

> The Department of Human Services, requires that providers be enrolled in order for services to be paid by Medical Assistance. In the long term care area, it is necessary for the provider to furnish the federal and state employer's identification numbers and the fiscal year and date. In addition, the provider must submit a cost report so the per diem rate can be calculated. When I called Mr. Gilbertson, the beginning of August, he refused to give me the information and questioned the propriety of having the facility certified for Title XIX. I called him again on August 26, to find out if the facility was ready to be enrolled. Mr. Gilbertson replied that their attorney was still looking into the matter to see if the facility had to be enrolled as a Title XIX provider. He stated that a decision could be forthcoming as early as this week. It should also be noted that the facility has not submitted a cost report.

Plaintiffs' Amended Exh. L.

On or about September 9, 1985, plaintiffs filed an administrative complaint with the United States Department of Health and Human Services Office of Civil Rights, seeking to compel defendants to comply with their obligations under the Hill-Burton law, specifically, to become Medicaid certified.

Meanwhile, defendants failed to provide the Minnesota Department of Human Services with the cost information necessary to complete the enrollment of the hospital's nursing home facility in the Medicare-Medicaid program and to set the allowable per diem rate per patient.

On October 15, 1985, the Minnesota Department of Health notified the hospital that the nursing home facility had been recertified for participation in the Medicaid program effective January 1, 1986 through December 31, 1986. However, it was not until about June 5, 1986 that defendants finally submitted the cost information to the Department of Human Services necessary to complete enrollment in the Medicaid program. The defendants began participating in the Medicaid program for nursing home facility patients in July 1986.

In September 1986, defendants and the Federal Office of Civil Rights entered into a compliance agreement, in which defendants agreed to participate in the Medicaid program. The agreement stated that:

On September 6, 1985, the complainant filed a complaint with OCR. The complaint alleged that the nursing home portion of Fairmont Community Hospital Association, Inc. was neither participating in nor enrolled in the Medicaid program.

OCR conducted an investigation of the complaint pursuant to the Department of Health and Human Services regulations 42 CFR Part 124, Subpart G (124.601 et seq.) which implement the Community Service Assurance obligation of Title VI of the Public Health Service Act. *OCR's investigation indicated that while the Recipient is eligible to participate in the Medicaid program it has not taken the necessary steps to complete its application to have its nursing home facility participate in the Medicaid program.*

The *Recipient does not admit that it has violated 42 CFR 124.601 et seq., or that these regulations apply to Recipient,* and it is understood that this Agreement in no way constitutes an admission by the Recipient of any violation of 42 CFR 124.601 et seq. or any other Hill-Burton regulations.

Plaintiffs' Exh. M (emphasis added). Additionally, OCR's supervision of defendants' compliance with the agreement was limited to one year, until late 1987.

Defendants are presently certified for Medicaid participation through December 31, 1987. Defendants contend there is no evidence this status will change. Plaintiffs, however, argue that defendants have repeatedly acted in bad faith by deliberately not complying with Medicaid participation requirements and by pulling out of the program, and that a court order finding that defendants are in fact *required* under Hill-Burton law to remain Medicaid providers for nursing home facility patients for the life of the hospital is necessary to ensure continued compliance by defendants. Defendants refuse to admit that they are bound under Hill-Burton to participate in

Medicaid, apparently because the hospital does not wish to "jeopardize the financial health of the hospital in the future because it would not allow the hospital to be flexible in reacting to changes in the health-care industry.... We have every intention to say [sic] in the (Medicaid program), but to sign a legal statement ... is not wise. It could tie our hands down the road." Plaintiffs' Exh. U, quote by defendant Gilbertson reported in the *Sentinel* newspaper of Fairmont, Minnesota, Aug. 8, 1986.

Both parties move for summary judgment. Plaintiffs seek an order of the Court declaring that defendants are required to provide services and are required to provide services under the Medicaid program to Medicaid-eligible persons now and in the future pursuant to 42 U.S.C. § 291c(e) and 42 C.F.R. § 124.601–.607 [Hill-Burton law and regulations pursuant thereto]. Defendants cross-move for summary judgment, arguing that (1) the case is moot; and (2) retroactive application of the 1979 Hill-Burton regulations to the hospital's nursing home facility constitutes unconstitutional deprivation of due process and impairment of contract.

## DISCUSSION

A defendant is not entitled to summary judgment unless the defendant can show that no genuine issue exists as to any material fact. Fed.R.Civ.P. 56(c). Summary judgment is an extreme remedy that should not be granted unless the moving party has established a right to judgment with such clarity as to leave no room for doubt and unless the nonmoving party is not entitled to recover under any discernible circumstances. *E.g., Vette Co. v. Aetna Casualty & Surety Co.*, 612 F.2d 1076, 1077 (8th Cir.1980). In considering a summary judgment motion, a court must view the facts most favorably to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *E.g., Hartford Accident & Indemnity Co. v. Stauffer Chemical Co.*, 741 F.2d 1142, 1144–45 (8th Cir.1984). The nonmoving party may not merely rest upon the allegations or denials of the party's pleading, but must set forth specific facts, by

affidavits or otherwise, showing that there is a genuine issue for trial. *Salinas v. School District of Kansas City*, 751 F.2d 288, 289 (8th Cir.1984).

This case presents two questions:

(1)(a) Do the 1979 regulations requiring that Hill-Burton fund recipients participate in Medicare-Medicaid unconstitutionally impair defendants' constitutional right to due process or right to contract? (b) Were these regulations within the Secretary of HHS' authority to promulgate?

(2) Does defendants' present participation in the Medicaid program render this litigation moot?

As defendants have pointed out, this is a case of first impression in the District of Minnesota and the Eighth Circuit. There is some case law in other jurisdictions on the issues presented to the Court. However, due to the infrequency with which this situation arises, a brief discussion of the legislative and case law history of the Hill-Burton Act is appropriate.

### The Hill-Burton Act

As stated earlier, the legislative intent of the 1946 Hill-Burton Act was to create state systems for provision of hospital and health care services to all persons, regardless of ability to pay. *Euresti v. Stenner*, 458 F.2d 1115, 1117–18 (10th Cir.1972). The Hill-Burton program dispersed nearly $6 billion in federal construction and modernization assistance funds for health care facilities throughout the country. *Report on Hill-Burton Hospitals and Their Obligations by the Subcommittee on Health and Environment, House Committee on Energy and Commerce*, 98th Cong., 1st Sess. 1 (Committee Print 98–D, April 1983). The Act itself included the community service and uncompensated care assurance/obligation provisions for receipt of these funds. However, from 1947 to 1972 there was no regulation defining "community service," and 42 C.F.R. § 53.112, the only relevant regulation involved, simply tracked the general "community service" language of the statute itself. No compliance standards, monitoring or enforcement of 42 C.F.R. § 53.112 occurred during this time period. As one commentator noted, "The hospitals receiving [Hill-Burton] aid

displayed a marked reluctance to give even the most token charitable care." *See,* Note, *Provision of Free Medical Services by Hill-Burton Hospitals,* 8 HARV.C.R.-C.L.L.REV. 351, 352 (1972).

Thus, in the early 1970's, courts began to be faced with numerous lawsuits brought by low-income persons seeking Hill-Burton health facilities' compliance with the community service and uncompensated case assurances. In the *Euresti* case, the United States Court of Appeals for the Tenth Circuit construed the Hill-Burton Act (then Title VI of the Public Health Service Act) to confer a private right of action. The court further held that a contractual relationship is created when a hospital signs an application for Hill-Burton funding which contains the statutory assurances. *Euresti,* 458 F.2d 1118.

Then, in *Cook v. Ochsner Foundation Hospital,* 61 F.R.D. 354 (E.D.La.1972) the court ordered the Secretary of HEW (now HHS) to require Hill-Burton health facilities to participate in Medicaid and to cease exclusion of patients who were Medicaid recipients. As the *Cook* court stated:

> To admit Medicaid insured patients as other privately insured patients are admitted is to treat all citizens alike—whether they are rich or poor, black or white. Not to follow this policy is discrimination prohibited by the law and the regulations cited....
>
> .... The failure of the Secretary of Health, Education, and Welfare to "prescribe regulations" which would prohibit such discriminatory admit practices by the defendant hospitals is in disregard of the provisions and intent of the Hill-Burton Act.

*Id.* at 61 F.R.D. 360–61.

In 1972 the Secretary of HEW issued a series of interim community service regulations, *see* 37 Fed.Reg. 147 (1972), and in 1973 issued a finalized version of these regulations. 38 Fed.Reg. 16353 (June 22, 1973). In 1974, new community service compliance standards and reporting requirements were initiated. 39 Fed.Reg. 31766 (Aug. 30, 1974); 42 C.F.R. §§ 53.111,

53.113. These 1974 community service regulations provided, *inter alia,* that:

An applicant ... [m]ake arrangements, if eligible to do so, for reimbursement for services with: ... those ... governmental third-party programs, such as Medicare and Medicaid, *to the extent that the applicant is entitled to reimbursement at reasonable cost under a formula established in accordance with applicable Federal law.*

42 C.F.R. § 53.113(d)(2)(i)(B) (emphasis added). These 1974 regulations required Hill-Burton facilities to participate in the Medicaid and Medicare programs except when the applicant's costs were unreasonable by federal standards. Under this regulation, an applicant for Hill-Burton funding could presumably argue that it was not required to participate in Medicaid/Medicare because the costs of participation would be unreasonable by federal standards.

In 1975 the National Health Planning and Resources Development Act, P.L. 93–641, was enacted to authorize a new Hill-Burton program, Title XVI, of the Public Health Service Act, 42 U.S.C. § 300q *et seq.* Congress was extremely critical of facility noncompliance and the lack of proper regulatory enforcement under the old Hill-Burton program, calling both a "sorry performance." S.Rep. No. 1285, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Ad.News 7842, 7900. The Title XVI provisions were intended to strengthen enforcement of the uncompensated care and community service obligations under Title XVI and Title VI. *Id.*

Thus, Title XVI, 42 U.S.C. § 300s–1(b)(1)(K), required applicants for federal Hill-Burton funds to give

reasonable assurance that at all times after such application is approved (i) the facility or portion thereof to be constructed, modernized, or converted will be made available to all persons residing or employed in the area served by the facility, and (ii) there will be made available in the facility or portion thereof to be constructed, modernized, or converted a reasonable volume of services to persons unable to pay therefor and the Secretary, in determining the reasonableness of the volume of services provided, shall take into consideration the extent to which compliance is feasible from a financial viewpoint.

Title XVI also mandated the Secretary to issue new regulations setting compliance and monitoring standards for all 700 Hill-Burton facilities. 42 U.S.C. § 300s(3). The Secretary was also given extensive investigative and enforcement powers under Title XVI. 42 U.S.C. § 300s–6. However, despite these changes in the law, the Secretary still failed to issue the new required regulations.

In 1979 Congress strongly criticized the Department of HHS for its ineffective and inactive enforcement of the Hill-Burton law. The House Committee on Interstate Foreign Commerce noted

that despite the explicit language of the current law, the Secretary has not yet issued any final regulations or begun to collect any compliance data.... The committee notes that the Secretary has not promulgated final regulations implementing the existing enforcement provisions. The committee heard testimony that some assisted facilities are not in compliance with their assurances. The committee wishes to *reaffirm its intention that the assurances be vigorously enforced* so that a facility constructed or modernized with the aid of Federal funds will, in fact, be available to all members of the community in which the facility is located, including ... persons unable to pay.

H.Rep. No. 190, 96th Cong., 1st Sess., 95–96 (1979) (emphasis added).

The Senate Committee on Labor and Human Resources also voiced serious concern over the lack of vigorous enforcement of the community service obligation of the Hill-Burton Act:

Equal access to quality health care cannot be achieved if individuals in need of services are denied care due to exclusionary or discriminatory admissions policies and practices of facilities that have in the past received limited Federal funds. Accordingly, [the Senate Committee on Labor and Human Resources] expects that *the Secretary will implement and en-*

*force compliance with these assurance [sic] as vigorously and expeditiously as possible.*

S.Rep. No. 96, 96th Cong., 1st Sess. reprinted in 1979, U.S.Code Cong. & Ad.News 1306, 1396 (emphasis added).

The Secretary of HHS finally promulgated new community service regulations on May 18, 1979. 44 Fed.Reg. 29372–29410 (1979). These new regulations contained important clarifications of regulatory policy and intent. Specifically, 42 C.F.R. § 124.603(c) requires that in order for a Hill-Burton facility to comply with its community service assurance,

> [t]he facility shall make arrangements, if eligible to do so, for reimbursement for services with: ... (ii) Federal governmental third-party programs, such as medicare and medicaid....
>
> The facility shall take any necessary steps to insure that admission to and services of the facility are available to beneficiaries of the governmental programs specified in paragraph (c)(1) of this section without discrimination or preference because they are beneficiaries of those programs.

The validity of 42 C.F.R. § 124.603(c) has been upheld by two different federal circuit courts. *American Hospital Association v. Schweiker,* 721 F.2d 170 (7th Cir.1983); *Wyoming Hospital Association v. Harris,* 727 F.2d 936 (10th Cir.1984). These cases held that the 1979 community service regulations apply to any facility receiving Title VI or XVI Hill-Burton assistance which gave an assurance that it would make its facility or assisted portion thereof available to all persons residing in the territorial area served. 42 C.F.R. § 124.601.

With the preceding background in mind, the questions presented by the case at bar can now be examined.

**(1)(a) Do the 1979 regulations requiring that Hill-Burton fund recipients participate in Medicare-Medicaid unconstitutionally impair defendants' constitutional right to due process or right to contract?**

■ Article I, Section 10 of the United States Constitution states:

> No State shall ... [pass any] ... Law impairing the Obligation of Contracts.

This clause does not apply to the federal government. However, a flagrant impairment of contract by a federal governmental body would be forbidden by the due process clause of the fifth amendment of the United States Constitution.

Defendants' impairment of contract/due process argument stems from several cases which have held that conditions imposed on federal recipients of government funding must be stated in unambiguous terms, or else such conditions constitute unconstitutional impairment of contract by reason of lack of due process. *See, e.g., Pennhurst State School & Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981); *Lieberman v. University of Chicago,* 660 F.2d 1185, 1187 (7th Cir.1981).

*Pennhurst* involved the Developmentally Disabled Assistance and Bill of Rights Act, which established a federal-state grant program similar to the Hill-Burton Act in that federal funds were provided to states, enabling them to create programs for the care and treatment of developmentally disabled persons. Like Hill-Burton, the DDA Act is voluntary; states may comply with the conditions of the Act or forego the benefits of federal funding. The Act provided, in its section 6010, that mentally retarded persons have a right to appropriate treatment, services and habilitation in the setting that is least restrictive of personal liberty. Following disclosures of inhumane and dangerous conditions at the hospital, plaintiff hospital residents sued to force the state to establish "community living arrangement," arguing that such arrangements were mandated by the Act's "least restrictive" language. The Court held, however, that section 6010 of the Act expressed only a preference for certain kinds of treatment, and not specific obligations to provide the treatment sought by plaintiffs. The Supreme Court reasoned as follows:

> Turning to Congress' power to legislate pursuant to the spending power, our cases have long recognized that Congress may fix the terms on which it shall

disburse federal money to the States.... Unlike legislation enacted under § 5, however, legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the "contract." ... There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.... By insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their participation.

*Id.,* 451 U.S. at 17, 101 S.Ct. at 1539–40 (citations omitted). The Court went on to state:

Our conclusion is also buttressed by the rule of statutory construction established above, that Congress must express clearly its intent to impose conditions on the grant of federal funds so that the States can knowingly decide whether or not to accept those funds. That canon applies with greatest force where, as here, a State's potential obligations under the Act are largely indeterminate. It is difficult to know what is meant by providing "appropriate treatment" in the "least restrictive" setting, and it is unlikely that a State would have accepted federal funds had it known it would be bound to provide such treatment. The crucial inquiry, however, is not whether a State would knowingly undertake that obligation, but whether Congress spoke so clearly that we can fairly say that the State could make an informed choice. In this case, Congress fell well short of providing clear notice to the States that they, by accepting funds under the Act, would indeed be obligated to comply with § 6010. Not only does § 6010 lack conditional language, but it strains credulity to argue that participating States should have known of their "obligations" under

§ 6010 when the Secretary of HHS, the governmental agency responsible for the administration of the Act and the agency with which the participating States have the most contact, has never understood § 6010 to impose conditions on participating States. Though Congress' power to legislate under the spending power is broad, it does not include surprising participating States with post acceptance or "retroactive" conditions.

*Id.* at 451 U.S. 24–25, 101 S.Ct. at 1543–44. *See also, Lieberman,* 660 F.2d at 1187–90, involving the question of whether Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) impliedly provided a damage remedy to victims of sex discrimination. The *Lieberman* court, citing *Pennhurst,* stated that

■n order to ensure a "meeting of the minds" [necessary to form a valid contract], the conditions imposed by Congress must be stated in unambiguous terms.

*Lieberman,* 660 F.2d at 1187.

■ The question in the case at bar then is whether the defendants voluntarily and knowingly accepted the terms of their Hill-Burton contract, cognizant of the potential consequences of participation in the Act. This exact question was presented to the Tenth Circuit in *Wyoming Hospital Ass'n v. Harris,* 727 F.2d 936 (1984). The Tenth Circuit first concluded that the 1979 regulations at issue were within the Secretary of HHS' statutory authority to make, and were rationally related to the purposes of the Hill-Burton Act. The court then held that the retroactive application of the 1979 regulations did not impair plaintiffs' right to contract:

The plaintiffs claim that the regulations impermissibly impair the hospitals' contractual rights by adding conditions to which they did not assent at the time they received the funds. The trial court declined to reach the question as to whether a contract existed between the federal government and the hospitals, preferring to hold that whatever obligations existed between the government and the hospitals were "governed at

least in part by 42 U.S.C. § 291c(e)." We agree. The distinction between whether the Hill-Burton funding was contractual in nature or made pursuant to the government's authority under the spending clause is not necessary to our decision. The obligations under § 291c(e) for community service and the assurance of a reasonable volume of uncompensated care were extant at the time funding was made. So too was the requirement of compliance with regulations issued pursuant to § 291c. 42 U.S.C. § 291e(b). Thus, any Hill-Burton funding was made expressly subject to compliance with the regulations issued under § 291c(e).

That the Secretary's discretion under § 291c is broad and open-ended does not impair the hospitals' rights. If the regulations are rationally related to the statute and in compliance with the Administrative Procedure Act, the fact that they upset the expectations of the parties does not condemn them.... As we held above, the regulations comport with this standard.

The current regulations may be more stringent than previous regulations issued under § 291c(e), but as the court noted in *The Darlington,* "Those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." 358 U.S. 84, 91, 79 S.Ct. 141, 146, 3 L.Ed.2d 132. Consequently, we hold that a change in the regulations does not constitute an unconstitutional impairment nor is it a wrongful derogation of the plaintiffs' due process rights.

The plaintiffs' claim that the regulations are constitutionally infirm as retroactively applied is not well founded. While the regulations may not be in accord with the hospitals' expectations of how the assurances would be enforced, "[s]uch inconsistencies are not equivalent to unconstitutionality." ...

*Wyoming Hosp. Ass'n,* 727 F.2d at 940–41 (citations omitted).

■ From the time that defendants in the case at bar entered into the Hill-Burton program in 1969, a community service/uncompensated care obligation was part of

the deal. The whole purpose behind enactment of the Hill-Burton Act was to provide federal funding to hospitals so that the provision of health care services could be assured to "all persons." The defendants were on notice when they applied for and accepted the Hill-Burton funds that such application and acceptance carried with it an obligation to assure provision of community service and uncompensated care in the facilities receiving the funds, such as the nursing home known as the Lutz Wing. Additionally, 42 U.S.C. § 291c(e) made Hill-Burton funding expressly subject to compliance with regulations issued by the Secretary of HEW (HHS) regarding the community service/uncompensated care provisions of the Act. Thus, the *Pennhurst* principle that "Congress must express clearly its intent to impose conditions on the grant of federal funds so that the States can knowingly decide whether or not to accept those funds" cannot be said to have been violated here. *Pennhurst,* 451 U.S. at 24, 101 S.Ct. at 1543. The reasoning of the Tenth Circuit in *Wyoming Hosp. Ass'n.,* therefore, is sound, and will be adopted in the case at bar.

**(1)(b) Did the Secretary of HHS exceed his authority in promulgating the 1979 regulations?**

■ As to defendants' argument that the Department of HHS exceeded its authority in promulgating the 1979 Medicare/Medicaid regulations, both the Tenth Circuit in *Wyoming Hosp. Ass'n.* and the Seventh Circuit in *American Hosp. Ass'n v. Schweiker,* 721 F.2d 170 (1983) have rejected this argument. As the Seventh Circuit stated in *Schweiker,* after reviewing the legislative history of the Hill-Burton Act noted earlier in this memo:

[The] rather detailed account of the legislative history of the provision before us provides abundant evidence that Congress—both in 1946 and in 1975—strongly intended that the words of the statutory assurances be given a practical reality, with the result that facilities receiving funds under the federally assisted programs would indeed "be made available to all persons residing in the territo-

rial area of the applicant ... [including] a reasonable volume of services to persons unable to pay...." 42 U.S.C. § 291c(e). We hold, therefore, that the Secretary was acting within his statutorily prescribed authority in promulgating the 1979 regulations at issue here.

*Schweiker,* 721 F.2d at 178.

Defendants argue the *Wyoming Hosp. Ass'n.* and *Schweiker* cases are wrongly decided, both in holding that the 1979 Hill-Burton Medicare-Medicaid regulations have retroactive effect and that the Secretary of HEW/HHS had the authority to promulgate these regulations. However, the legislative history supports the holdings of the Tenth and Seventh Circuits on these issues, and it is of some note that there do not appear to be any court decisions holding otherwise. Defendants argue, however, that the courts have ignored the problems imposed by retroactive application of the 1979 regulations. Defendants' argument relies on prior law, specifically 42 U.S.C. § 300*o*–1(6), which allowed the Secretary of HEW to:

> prescribe the general manner in which each entity which receives financial assistance under this subchapter or has received financial assistance under subchapter IV of this chapter [Title VI] shall be required to comply with the assurances required to be made at the time such assistance was received and the means by which such entity shall be required to demonstrate compliance with such assurances.

Defendants rely on a dissent by Judge Pell in *American Hosp. Ass'n v. Harris,* 625 F.2d 1328 (7th Cir.1980) (appeal from denial of preliminary injunction), in which Judge Pell discussed section 300*o*–1(6) and stated that:

> Thus, in Title XVI, Congress clearly manifested an intent that the assurances, made at the time that federal assistance was received, should be given effect. Because the AHA's members received funding under Title VI only, the extent of their obligations must therefore be measured in terms of the assurances given at the time each facility entered into

its contract with the federal and state governments.

*Harris,* 625 F.2d at 1340.

First, 42 U.S.C. § 300*o*–1(6) was repealed on October 4, 1979. Pub.L. 96–79, Title II, § 202(a), 93 Stat. 632. This section was repealed as part of Congress' revamping of Hill-Burton law to bring facilities into compliance with the purposes of the Act and to encourage stricter regulatory enforcement of the Act. Second, section 300*o*–1(6), while in force, did put Hill-Burton fund recipients on notice of the Secretary's regulatory and enforcement powers with regard to the community service and uncompensated care obligations. Lastly, Judge Pell's dissent, and defendants, miss the point illustrated by the Hill-Burton Act's legislative history—*i.e.,* that at the time the federal assistance was received, there *were* community service/uncompensated care obligations assumed, and later redefining of those obligations did not change the underlying nature of the obligations, but simply expressed their meaning in a more concrete and explicit manner. Moreover, these changes were mandated by Congress because of massive non-compliance with, and non-enforcement of, the general community service/uncompensated care obligations. It is disingenuous for facilities involved in this situation of non-compliance to complain about regulations passed in response to the need to force compliance.

In sum, therefore, the Court concludes that the 1979 regulations, requiring Hill-Burton fund recipients to participate in Medicare-Medicaid, did not unconstitutionally impair defendants' due process/right to contract rights. Furthermore, the Court concludes that it was within the Secretary of HHS' authority to promulgate these 1979 regulations.

**(2) Does Defendants' Present Participation in the Medicaid Program Render This Litigation Moot?**

■ Article III Section 2 of the United States Constitution states:

> The judicial Power [of the United States] shall extend to all Cases, in Law and Equity, arising under this Constitution,

the Laws of the United States, and Treaties made ... under their Authority.... This section has been interpreted to require that a live case or controversy must exist before a federal court can exercise jurisdiction over a matter. Where there are:

> no 'actual matters in controversy essential to the decision of the particular case' [the court shall not] give opinions upon moot questions or abstract propositions, or ... declare principles or rules of law which cannot affect the matter in issue in the case before it.

*Oil Workers Union v. Missouri*, 361 U.S. 363, 367, 80 S.Ct. 391, 394, 4 L.Ed.2d 373 (1960) (citations omitted). Moreover, a real, live controversy must exist at all stages of the court's review of a matter, not just when the complaint is filed. *See, e.g., De Funis v. Odegaard*, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974) (dismissing as moot a white law student's challenge to state affirmative action program where student was about to graduate from law school when the case reached the Supreme Court).

The one exception to the mootness doctrine is for controversies capable of repetition but evading review. This exception applies to issues concerning events of short duration, such as pregnancy, elections, divorce actions, or to cases involving a reasonable expectation that the plaintiff or the class plaintiff represents will be subjected to the same actionable behavior again. *See Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

■ Defendants argue that the case at bar is moot because the relief plaintiffs seek, *i.e.* acceptance of Medicaid patients at defendant hospital's nursing home facility, has already been achieved. Defendants argue that since the nursing home facility has entered into an agreement with the Minnesota Medical Assistance program to be a participating provider until December 1987, and since defendants have agreed not to transfer plaintiff Armstrong or any others in her situation, there is no real, live controversy before the Court.

Defendants cite two recent Eighth Circuit cases in support of their argument. In *Gelco Corp. v. Coniston Partners*, 811

F.2d 414 (8th Cir.1987), a tender offeror sought a preliminary injunction prohibiting the target corporation from seeking enforcement of the Minnesota Control Share Acquisition Act, which would thwart the tender offeror's acquisition efforts. The court denied the injunction request and ruled that the Minnesota Act was unconstitutional. The Eighth Circuit affirmed the denial of the injunction, but vacated the finding that the Minnesota Act was unconstitutional because the issue was moot. The Eighth Circuit stated:

> The district court declared the Minnesota Control Share Acquisition Act unconstitutional under both the commerce clause and the supremacy clause. [Defendant] terminated its initial tender offer on November 13, 1986. *[Defendant] has expressed an intent to bring a new tender offer only if this court grants [defendant] its requested injunctive relief and declares the Minnesota Act inapplicable or unconstitutional.* Because we have rejected [defendant's] claims for injunctive relief, it is apparent that no new tender offer would be forthcoming even if we declared the Minnesota Act unconstitutional. Furthermore, [defendant's] failure to acquire any [of plaintiff's] shares pursuant to its tender offer, coupled with the Minnesota Act's limited remedial provisions, virtually assures that [defendant] will not be subjected to any civil or criminal actions by virtue of its failure to comply with the Minnesota Act....
>
> The parties, especially the State of Minnesota, are undoubtedly interested in having these constitutional issues resolved, for they will quite likely be raised again in the context of another tender offer. But interest, by itself, does not create a justiciable matter. The constitutional issues raised in this appeal are moot.

*Gelco Corp.*, 811 F.2d at 421 (footnote omitted) (citations omitted) (emphasis added). Thus, the case was moot because the appellant had itself stated that the act creating the controversy, *i.e.*, the tender offer, would not occur again. In other words, the controversy *between the parties before the*

*court* was not capable of repetition, and thus the question of the Minnesota Act's constitutionality was only of abstract interest, and therefore nonjusticiable. In the case at bar, however, defendants have made it clear that they do not want to be permanently, legally bound to accept Medicaid patients in the nursing home facility. Thus, by defendants' own statements, they have shown that the controversy between the parties before the Court over the applicability of the 1979 Hill-Burton Medicaid regulations is capable of repetition.

The second case cited by defendants in support of their mootness argument is *Slaughter v. Levine,* 801 F.2d 288 (8th Cir.1986). *Slaughter* involved a class action suit brought by recipients of AFDC benefits challenging the Commissioner of the Minnesota Department of Public Welfare's failure to adhere to federal regulations in administering a lump-sum rule. Defendant appealed from the order of the district court. Part of the order appealed from was the Court's directive to defendant to send *Quern* notices to class members. The Eighth Circuit held that defendant's appeal from this portion of the order was rendered moot because the *Quern* notices were mailed before the appeal was argued. As the Eighth Circuit stated:

> Therefore, so far as the propriety of sending this notice is concerned, there remains no live controversy between [defendant] and the plaintiffs on which a federal court could grant relief.

*Slaughter,* 801 F.2d at 299. Again, in the case at bar, based on defendants' own statements, the controversy between the parties is indeed capable of repetition.

At first blush, defendants' mootness argument seems to have merit. Defendants have agreed to participate in the Medicaid program through December 1987. However, defendants' provider agreement must be recertified annually by the Minnesota Department of Health, and defendants could simply fail to renew their agreement or, as they have done in the past, refuse to comply with the procedures required by the state to retain certification. Moreover, defendants' contention that they are not bound by the 1979 Hill-Burton regulations

and their insistence that they remain free to drop out of the Medicaid program if it becomes "financially infeasible" for them to continue to participate in the program creates a substantial likelihood of repetition of the controversy presently before the Court.

Additionally, defendants' past history supports a finding that this controversy is capable of repetition. From 1969, when defendants received Hill-Burton funding from the federal government, until July 1, 1986, when defendants were certified to participate in the Medicaid program, there is no evidence that defendants met their community service/uncompensated care obligations with regard to the nursing home facility. The facility was certified for participation in the Medicaid program in 1973, but defendants withdrew from the program in 1974, refusing to comply with the required state procedures for program participation. In fact, despite defendants' contention that they sought certification in 1986 because it was suddenly "financially feasible" to do so, it is difficult to imagine that the decision to seek certification really had nothing to do with the intense community agitation over the issue and the filing of an administrative agency complaint and this federal lawsuit.

■ Therefore, the Court concludes that this case is not moot. Voluntary cessation of allegedly illegal conduct does not deprive a court of the power to hear and decide a case, because a defendant is free to engage in the conduct again. *See United States v. TransMissouri Freight Association,* 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007 (1897). Moreover, the Supreme Court has stated that a case is only moot—

> if the defendant can demonstrate that "there is no reasonable expectation that the wrong will be repeated." The burden is a heavy one.

*United States v. W.T. Grant,* 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953) (citation omitted). The Supreme Court went on to state that a defendant's statement that the challenged conduct will not be repeated does not meet this burden,

although it is a factor for a court to consider. The Court stated that:

> expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations [are other factors to be considered].

*W.T. Grant*, 345 U.S. at 634, 73 S.Ct. at 898. Thus, given the facts of the case at bar, the defendants' refusal to express a definite intent to comply with the 1979 regulations, and the length of time of alleged past violations, this case will not be dismissed as moot.

Based on the foregoing, the Court finds that defendants received funds under the Hill-Burton Act, 42 U.S.C. §§ 291 *et seq.*, to construct a general hospital and nursing care unit and, pursuant to the requirements of the Act, gave assurance that the facility would provide a community service. The community service assurance, pursuant to 42 U.S.C. § 291c(e) and 42 C.F.R. § 124.603(c), requires participation in the Medicaid program.

Therefore, IT IS ORDERED that

1. Plaintiffs' motion for summary judgment is granted as there is no genuine issue of material fact and they are entitled to judgment as a matter of law.

2. Defendants are required to obtain and maintain proper certification with the Minnesota Department of Health and a provider agreement with the Minnesota Department of Human Services for participation in the Medicaid program, and to accept Medicaid patients who are suitable for convalescent and nursing home treatment in the Lutz Wing until proper application to, and further order of, this Court.

LET JUDGMENT BE ENTERED ACCORDINGLY.